745 F.Supp. 1486 (1990)
Rosetta J. GREENE, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 87-1981C(3).
United States District Court, E.D. Missouri, E.D.
June 25, 1990.
*1487 *1488 Marc S. Wallis, Newman and Bronson, St. Louis, Mo., for plaintiff.
Eric T. Tolen, Asst. U.S. Atty., for defendant.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court to determine the merits of plaintiff's claims after a two day trial before the Court sitting without a jury.
Pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq., plaintiff seeks $500,000 for injuries she allegedly sustained as a result of a fall on a stairway on property owned by the United States government. Plaintiff asserts and defendant denies that defendant is liable in tort for plaintiff's injuries.
Having carefully considered the live and deposition testimony of the witnesses, the exhibits introduced at trial, the relevant pleadings, the parties' stipulations, and the parties' positions, the Court makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Rosetta J. Greene, who was fifty six years old at the time of the incident at issue in this case, lives in Saint Louis, Missouri, and is a licensed practical nurse. Between January 31, 1983, and March 22, 1989, she was employed by Minact, Inc. ("Minact") to work at the St. Louis Job Corps Center located at 4333 Goodfellow Boulevard, Saint Louis, Missouri ("St. Louis Job Corps Center") as a nurse at the infirmary and as an instructor of nursing students. Starting in March 1985, and throughout the rest of 1985, Ms. Greene was an instructor.
2. As defendant conceded in its answer, and as the Eighth Circuit found, Greene v. United States of America, 872 F.2d 236, 236 (8th Cir.1989), the United States owned, managed, maintained, and controlled the St. Louis Job Corps Center property at all relevant times.
3. At all relevant times, the agents and employees of defendant were acting within the course and scope of their employment.
4. In general the Job Corps is a federal government program providing education, vocational training, and other services to disadvantaged young persons between the ages of sixteen and twenty one through contract centers and Civilian Conservation Centers. The St. Louis Job Corps Center is a center operated by Minact under a contract with the United States Department of Labor ("DOL"). The federal government funding for this center included money for the payment of worker's compensation claims.
5. The St. Louis Job Corps Center is subject to federal government monitoring through a DOL project manager (also known as a Government Authorized Representative) and others who work for the federal government. The project manager for the St. Louis Job Corps Center during the relevant period of time was James Purgason, who has worked at the DOL with respect to the Job Corps program since 1979. In part the project manager monitors the contractor's compliance with and performance of contract obligations through on-site inspections at least once a year and the review of written information. Mr. Purgason made more than one visit a year to the St. Louis Job Corps Center. During these visits, the premises were inspected. If something was deemed unsafe, Mr. Purgason recommended it be remedied.
6. Each year a Job Corps Center may seek federal government approval for funding of miscellaneous Vocational Skills Training ("VST") projects. The project manager assigned to the Jobs Corps Center and, if necessary, other federal government *1489 personnel give the needed approval prior to the construction of any VST project.
7. Prior to April 10, 1985, a set of cement steps ("stairwell") outside the Health Occupations Building at the St. Louis Job Corps Center had been built by St. Louis Job Corps Center students as an approved VST project. As of April 10, 1985, however, the stairwell did not have a handrail on either side of the stairs, although the holes for such handrails were present. The stairwell had been in that state for some time. During wet weather, mud and other slippery substances accumulated on the steps. There is no indication of record this stairwell was inspected by Mr. Purgason.
8. The unsafe condition of the stairwell had been reported sometime prior to April 10, 1985. Mr. Purgason did not ask that the handrails be installed or that the steps be kept clear at any time before April 10, 1985.
9. Upon her arrival at the St. Louis Job Corps on April 10, 1985, plaintiff noticed patches of dirt on the steps. While it was not raining when she arrived at work, it drizzled throughout most of the day and was raining when she left work. There was mud on the steps by the time plaintiff left work that day. The cement stairwell was in an unsafe condition when it had no handrails and mud on the steps.
10. As she was leaving work that day, plaintiff fell on the bottom step of the stairwell. Ms. Greene wore bifocal glasses on April 10, 1985. Otherwise there was no obstacle to or limitation on her sight or view of the steps that day. At the time of her fall, Ms. Greene was carrying an open umbrella and a purse, and was walking down the stairs one at a time.
11. Ms. Greene experienced severe pain and sustained a broken right ankle as a result of this fall.
12. The treatment of plaintiff's broken ankle consisted of a closed reduction procedure with a short cast placed on plaintiff's right leg in the area of the injury; plaintiff's use of crutches and medication for several weeks thereafter; the removal of the cast after approximately six to eight weeks; and several in-office visits to follow up the emergency room treatment initially provided at the hospital. While the severity of the pain was promptly alleviated through medical treatment, plaintiff suffered additional discomfort in the right ankle as she recuperated. By August 1, 1985 she was fully weight-bearing on her right leg. Upon her return to work plaintiff spent some time adapting the manner in which she performed her teaching duties so that she could sit, rather than stand, when her ankle was painful. While plaintiff now has full use of her right ankle, she is now unable to engage in certain activities she used to enjoy, including taking long walks and bicycle riding. On occasion, Ms. Greene feels an aching pain in the right ankle and that ankle swells.
13. The costs of medical treatment for plaintiff's right ankle totalled a reasonable amount of $372.20.
14. Ms. Greene missed approximately three months of work in 1985 as a result of this fall. During that time, she lost wages totalling $3,336.00 ($278.00 per week for twelve weeks).
15. Since she returned to work in 1985, she has been able to retain employment positions in the nursing field at salaries comparable to or better than the rate at which she was paid in 1985.
16. In June, 1986, plaintiff first complained of pain in her right hip. Although plaintiff reports she complained of such pain before then, this is the first time the doctor caring for her reported in his records the existence of such complaints and the proposed treatment of her hip. Having no reason to think the doctor caring for plaintiff's leg would ignore complaints of pain in the hip, the Court finds that plaintiff did not verbalize such complaints prior to June, 1986. Upon a diagnosis of degenerative arthritis in her right hip and after more conservative efforts to treat the hip were not successful, plaintiff had total hip replacement surgery in May, 1987. The reasonable costs of treatment of her right hip total $12,848.86. With respect to this hip surgery, plaintiff lost $3,905.20 in wages for the period from May *1490 21, 1987 to September 1, 1987 at the rate of $7.51 per hour for forty hours per week.
17. Ms. Greene's right leg was evaluated (and not treated) by Dr. M.B. Conrad, an orthopaedic surgeon, in October, 1986; by Dr. Ralph J. Graff, a general surgeon, in December, 1986, February 1988 and November, 1989; and by Dr. Simon Horenstein, a neurologist, in December, 1989. Doctors Conrad and Hornestein are of the opinion that Ms. Greene's right hip pain and related problems are not related to the April, 1985, fall. Dr. Graff opined that the hip problems are causally related to that fall. No one disputes that there is evidence of asymptomatic arthritic conditions in plaintiff's right hip before the April 10, 1985, fall. In reaching their opinions on the cause of plaintiff's right hip problems, each of these physicians relied on the length of time that elapsed between the fall and plaintiff's complaints of hip pain. Assuming plaintiff was active after she was weight-bearing, these doctors concur that the longer the period is between the fall and the hip complaints, the greater the probability that the hip problems were not related to the April 10, 1985, incident. Finding nothing credible of record to indicate that plaintiff's activity level was drastically reduced between the time she was weightbearing and the hip complaints first arose, the Court finds that the hip injury was unrelated to plaintiff's April 10, 1985 fall.
18. The $300.00 bill for Dr. Graff's services will not be taken into consideration in determining any damages to be awarded plaintiff because that bill is for evaluation services unrelated to the treatment of plaintiff's right leg.
19. It is undisputed that as of the date of trial, plaintiff had a life expectancy of 20.5 years.
20. Plaintiff has pending against Minact a worker's compensation claim arising out of the April 10, 1985, incident.
21. Plaintiff has complied with the prerequisites to the filing of this lawsuit through the filing with the federal government of an administrative claim, and the timely filing of the complaint in this case after the denial of the administrative claim.

Conclusions of Law
A. This Court has jurisdiction over this action, 28 U.S.C. § 1346(b), and venue is proper here, 28 U.S.C. § 1391(e).
B. The Federal Tort Claims Act provides in part that the United States will be liable in damages:
for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
28 U.S.C. § 1346(b). In such cases,
[t]he United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.
28 U.S.C. § 2674. Here, the United States' liability is predicated upon the allegedly unsafe condition of the stairwell outside the Health Occupations Building on the St. Louis Job Corps Center premises. The United States' liability is to be determined in accordance with the law of the State of Missouri, the state where the alleged negligence occurred. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); Stuppy v. United States, 560 F.2d 373 (8th Cir.1977); 28 U.S.C. § 1346(b).
C. Under Missouri law, an owner of leased premises is liable for unsafe premises only to the extent the property owner retains control over the premises. See Sirna v. APC Bldg. Corp., 730 S.W.2d 561, 564 (Mo.App.1987) (landlord's liability with respect to common area); Wingo v. Eagle Realty Co., 726 S.W.2d 805, 807 (Mo. App.1987) (same); Milne v. Pevely Dairy Co., 641 S.W.2d 158, 161 (Mo.App.1982) (landlord liable for unsafe condition of premises over which tenant surrendered its *1491 right to exclusive possession and control). Additionally, a possessor of property may be liable to invitees for injuries sustained as a result of unsafe conditions of which the possessor knew or should have known and which were not remedied. See Cox v. J.C. Penney Co., 741 S.W.2d 28 (Mo.1987) (en banc); Lott v. Anheuser Busch, Inc., 481 S.W.2d 517, 521 (Mo.App.1972) (employee of independent contractor is owed same duty from landowner as are other invitees).
Here, the record reflects that defendant had the requisite control over the property so as to find that defendant, as either a landlord or a possessor of the property, had a duty to provide safe premises to plaintiff. Not only did defendant concede it had control and management of the premises in defendant's answer to plaintiff's complaint, but the Eighth Circuit made such a finding in this case. Greene, supra. In light of defendant's answer and the appellate court's ruling, this Court is not persuaded that it is proper to further consider the property control and management issues raised by defendant.
D. Defendant contends, without explanation, that plaintiff was a licensee and not an invitee on the St. Louis Job Corps Center's premises. If plaintiff is a licensee, then she must take the premises as she found them unless defendant had actual knowledge of the unsafe condition. Here, however, plaintiff may be considered as being on the premises for the benefit of the federal government, Minact, and plaintiff. Thus, plaintiff was an invitee and not merely a licensee. Gruhalla v. George Moehler Constr. Co., 391 S.W.2d 585, 591-92 (Mo.App.1965).
E. To the extent defendant argues the existence of plaintiff's pending worker's compensation claim against her employer forecloses this tort action, that argument is not persuasive. Plaintiff is precluded from pursuing her claim against her employer through any means other than a worker's compensation claim. Mo.Rev. Stat. § 287.120 (1986); Zahn v. Associated Dry Goods Corp., 655 S.W.2d 769 (Mo.App. 1983) (finding no jurisdiction over claim against an employer for incident occurring on employer's premises as employee left work). Missouri's worker's compensation law, however, permits an action against a non-employer third party causing injury to an employee. See Penn v. Columbia Asphalt Co., 513 S.W.2d 679, 686 (Mo.App. 1974) (noting either the employee or the subrogated employer may pursue such an action); Mo.Rev.Stat. § 287.150 (1986). Since Minact is plaintiff's employer and defendant may be in the position of a non-employer third party causing injury to plaintiff, plaintiff's present claim against defendant is not barred.
F. Defendant argues that plaintiff's present claim is barred because defendant should be treated as a "statutory employer" of plaintiff. If so, then plaintiff is limited to a worker's compensation claim against defendant.
Mo.Rev.Stat. § 287.040.1 (1986) provides:
Any person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on shall be deemed an employer and shall be liable under this chapter to such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the usual course of his business.
The purpose of this statute is to prevent an employer's evasion of worker's compensation liability by hiring independent contractors to perform work otherwise performed by the employer's employees. Shipley v. Gipson, 773 S.W.2d 505, 507 (Mo.App. 1989); McGuire v. Tenneco, Inc., 756 S.W.2d 532, 534 (Mo.1988) (en banc). To establish the existence of a relationship encompassed by this statute,
each of three statutory elements must coexist: (1) the work was being performed pursuant to a contract; (2) the injury occurred on or about the premises of the alleged statutory employer; and (3) when injured the alleged statutory employee was performing work which was in the usual course of business of the alleged statutory employer. *1492 McGuire, 756 S.W.2d at 534. While this Court finds plaintiff's work was performed pursuant to a contract with Minact and the injury occurred on defendant's premises, the Court is unable to find that plaintiff was performing work that is in the usual course of defendant's business. The usual course of defendant's governing business does not clearly include teaching disadvantaged youth nursing skills. This is not a situation where a construction company hires independent contractors to perform some of the construction work. Nor is this a situation where defendant hired an independent contractor who was injured while developing regulations or legislation or while making policy decisions. Accordingly, the Court does not find that defendant is the "statutory employer" of plaintiff for purposes of Missouri's worker's compensation statutes.
G. Finally, defendant contends it is protected from liability for plaintiff's injuries by the discretionary function exception or independent contractor's exception.
The Federal Tort Claims Act has several exceptions to the federal government's waiver of sovereign immunity. The discretionary function exception provides that there shall be no liability for
[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
28 U.S.C. § 2680(a).
In considering whether the discretionary function exception applies to a given case, the Court looks to the nature of the conduct in question, rather than the status of the actor. Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). "In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee.... Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Id. If the conduct is not the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.
Once a court decides that the challenged conduct involves an element of judgment, then it must determine whether that conduct is the kind that the discretionary function exception was designed to shield. Id. In fashioning the exception, "Congress wished to prevent judicial `second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984).
Here, the relevant decision is Mr. Purgason's decision not to assure the installation of the stairwell handrail. While Mr. Purgason may have had discretion to approve or not approve the construction of that stairwell, once it was approved it had to be implemented with due care. Zuk v. United States, 698 F.Supp. 1577, 1580 (S.D. Fla.1988). Thus, the discretionary function exception does not bar plaintiff's claim.
Defendant's reliance on the independent contractor's exception is also not persuasive. The Federal Tort Claims Act excludes the federal government's liability for conduct by an independent contractor. 28 U.S.C. § 2671. In United States v. Orleans, 425 U.S. 807, 814, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976), the Supreme Court held that the power to control is pivotal in determining whether a contractor's performance may be imputed to the United States for purposes of the Federal Tort Claims Act. Here, the defendant conceded and the Eighth Circuit found that defendant had control over the St. Louis Job Corps Center's premises. Thus, the contractor's exception does not apply in this case.
H. Finding plaintiff is not precluded from pursuing this action; finding that defendant owed a duty to provide plaintiff safe premises; finding that defendant should have known of the unsafe condition of the relevant stairwell; and finding *1493 defendant did not take action to remedy or warn about that unsafe condition, the Court finds defendant is liable for the injuries caused by defendant's failure.
I. To determine the proper amount of damages, the Court must ascertain what amount will fairly and reasonably compensate plaintiff for her injuries. Sampson v. Missouri Pac. R.R. Co., 560 S.W.2d 573, 588 (Mo.1978) (en banc). The parties do not dispute that such damages may compensate plaintiff for her reasonable medical expenses, her lost earnings, for any diminished capacity to work, and for pain and suffering. Based upon the available record, the Court finds a total award of $13,708.20 will reasonably and fairly compensate plaintiff for the injuries sustained as a result of the April 10, 1985, fall. This amount consists of $372.20 in costs for the medical treatment of plaintiff's broken ankle; $3,336.00 in lost wages for the twelve weeks of work plaintiff missed in 1985; and $10,000.00 for plaintiff's pain and suffering. There is no evidence of record to indicate plaintiff has a diminished capacity to work as a result of the injuries she sustained.
J. To the extent comparative fault is applicable to this case, see, e.g., Cox, supra, the Court finds plaintiff was not at fault for the injuries she sustained. There is no credible indication of record that she was not paying attention to where she was stepping as she descended the relevant stairs or that she was walking too fast for conditions. Nor does the fact she was carrying items indicate she must be assessed some fault. There was no handrail or other available item to catch or stop any fall, even if her hands had been free. Additionally, the items she carried were not excessive. Finally, there is no indication that she should or could have done anything differently during the course of treatment to alleviate the extent of the injury or the pain she experienced.
Accordingly, based on the foregoing, judgment will be entered in favor of plaintiff in the total sum of $13,708.20, plus costs.