**David SUMNER**

v.

**UNITED STATES of America.**

No. 3:90–0204.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 29, 1992.

Dale M. Quillen, Irene R. Haude, James F. Neal, Thomas H. Dundon, Neal & Harwell, Nashville, Tenn., for plaintiff.

Harold Benton McDonough, Office of the U.S. Atty., Nashville, Tenn., for defendant.

MEMORANDUM

JOHN T. NIXON, Chief Judge.

Having held a trial without a jury in the above styled action, the Court makes the following findings of fact and conclusions of law.

## I. FACTS

On April 28, 1989, the eighteen year old plaintiff, David Sumner, his older brother, Michael, and their friend, William "Junior" Miles, Jr., travelled in Miles' car into an area known as the rear area of the Fort Campbell army base. The rear area comprises 105,000 acres of undeveloped land that the army uses for various purposes. The young men entered the base via a gravel road named Big Rock Road. A sign at the boundary of the base on Big Rock Road indicates that persons who enter the base consent to search by doing so and that solicitation and distribution of literature on the base without prior authorization is prohibited. Shortly after passing the sign, the three friends turned west onto a paved road called Jordan Springs Road and then, almost immediately, turned north onto another gravel road that led to a field in which a tank stood. After viewing the tank, the companions retraced their route to Jordan Springs Road and headed east. After several miles, they turned north onto an unmarked dirt road that the Army refers to as Parkertown Road. At the end of the dirt road, they crossed a dry creek bed and continued onto one of several pathways a short way before parking the car. On foot, they set out through a field in the direction of several rusted out military vehicles that had been used for target practice. On the way, they passed a small sign, about two feet by two feet, that stood approximately 98 feet from their course off to the right. The sign, which was not legible from the young men's position, read "DANGER" at the top and in smaller lettering below read "Unexploded Duds, Keep Out! Trespassing On Or Removal Of Any Item From Range Is Prohibited. By Order Of CG." Some of the red coloring around the word "DANGER" was faded.

David Sumner followed Michael Sumner and Junior Miles as they headed across the field toward the vehicles. As they walked through the field, the remains of fired ammunition were visible on the ground. Just as they neared the vehicles, there was a loud explosion. When Junior Miles and Michael Sumner turned around, they saw that David Sumner had been severely injured. They picked him up, carried him to the car, and drove him to a nearby house. There, they telephoned the Sheriff's office and emergency medical personnel.

Junior Miles accompanied David Sumner to the hospital and Michael Sumner went with Sheriff's Deputy John Vinson to the accident cite. On the way, Michael Sumner reportedly told Deputy Vinson that the accident occurred at around 3:30 p.m. in what the Army called the "rear impact area." According to Deputy Vinson, Michael also said that before the explosion occurred he heard David say "Look what I found." At the accident site, Deputy Vinson and representatives from the Explosive Ordnance Detachment and Military Police at Fort Campbell who met him there determined that dud ordnance from a light anti-tank weapon caused the explosion which injured David Sumner.

Several days later, Sergeant Paul Hicks, the officer in charge of the rear area military police at Fort Campbell, interviewed Junior Miles. Miles indicated that, at the time of the accident, he knew that he was in a prohibited area where the Army had target practice. Based on this information, the Army subsequently prosecuted Miles and Michael Sumner under 18 U.S.C. § 1382 for unlawfully entering a military reservation for purposes prohibited by law. The Army chose not to prosecute David Sumner because it mistakenly believed that David Sumner was a minor at the time of the accident and the Army's policy was not to prosecute juveniles. Miles entered a plea of guilty to the charge. After holding trial, a United States Magistrate found Michael Sumner guilty as charged.

The accident site was in fact the south impact area at Fort Campbell, one of several impact areas in the rear area at Fort Campbell. Impact areas are parcels of land dedicated to target practice by the military. According to Army regulations, they are primary areas of danger, while areas around them, called ricochet areas, are secondary areas of danger. Since highly dangerous unexploded duds are present in impact areas, the Army generally does not permit its personnel to walk on impact areas. Dud ordnance from light anti-tank weapons is extremely volatile and may be detonated with minimum contact. Pursuant to Army Regulation 385–63 ¶ 2–8(f), the Army is responsible for demarcating an impact area as follows:

> Besides the warning signals and signs used to prevent entry into the range during firing, *the boundaries of all range areas adjacent to roadways and points of entry or along the outside limits of ricochet areas, [sic] will be posted with permanent signs.* They will be placed *at 200 meter intervals or less, or in a way that will insure that a person cannot enter the range without seeing at least one sign within a legible distance.* The signs will emphasize the danger connected with the range area and the handling of unexploded ammunition. They will prohibit trespassing or the removal of items under penalties provided by law. Design, color, and size will conform to guidance in AR 385–30.

Army Reg. 385–63 ¶ 2–8(f) (emphasis added). Such warning signs would be the only way a civilian would know that he or she was entering an impact or ricochet area. In an effort to comply with these regulations, the Army erected aluminum signs at 200 meter intervals along the borders of the impact areas at Fort Campbell. This effort, however, did not comply with the Army regulations because it did not satisfy the requirement that "the boundaries of all range areas ... along the outside limits of ricochet areas, [sic] will be posted with permanent signs." *Id.* Other problems also arose in connection with the Army's efforts to comply with these regulations.

The aluminum signs were often stolen, apparently for their aluminum content. At trial, the Director of the Range Division at Fort Campbell, Paul Eaves, testified that as many as seventy-five warning signs were missing or not visible around impact areas at Fort Campbell at one time.[1] This detracted from the signs' "permanent" nature. At the time of the accident, for instance, the sign on the south impact area boundary that normally would have been located 200 meters to the left of the sign which David Sumner and his companions came nearest was missing. The sign that David Sumner and his companions came nearest itself was inside the boundary of the impact area, in violation of the regulations, instead of on the boundary of the impact area or the ricochet area. At the time of the accident, because the red coloring that outlined the white lettering of the word "DANGER" was faded, the word "DANGER" on the sign was almost illegible at any distance.[2] The signs used at Fort Campbell were two feet by two feet and had twenty-one words on them. Thus, even when not faded, the signs were not legible from one-hundred feet, no less from one-hundred meters as required by the regulations.[3]

In addition, another regulation compliance problem existed. Army Regulation 385–63 ¶ 2–10 provides:

---

1. The Army claims that daily patrols are equipped with extra signs to replace missing signs. Given Paul Eaves admission, however, it is doubtful that these patrols were effective at ensuring adequate signs would be in place.

2. This situation existed apparently for nearly a year after the accident in violation of Army Regulation 385–64 which required the Army to "ensure periodically that [warning] signs are restored and maintained in a legible condition."

3. At trial, Sergeant Homer S. Rogers stated that he could read the sign on his way to the accident site only because he knew what it said. This non-sequitur corroborates other witnesses' testimony which indicated that one could not read the sign from David Sumner's position as he walked from the car toward the abandoned vehicles.

c. The local news media will be used periodically *to warn the nearby communities of the hazards in trespassing on range areas and in handling unexploded ammunition.*

d. A program will be established *to educate school children, both on and off the installation, on range hazards.*

Army Reg. 385–63 ¶ 2–10 (emphasis added). The Fort Campbell Safety Manager responsible for compliance with these regulations was Cathy Pierce. Despite the regulation's clear language to the contrary, Cathy Pierce testified at trial that she considered her role to be limited to educating on-post military personnel. She stated that she lacked the expertise to educate others regarding the dangers of impact areas and unexploded duds. The Army at Fort Campbell neither used the local news media to educate the public about the hazards of unexploded duds in impact areas, nor did it establish a program to educate school children in the surrounding areas about such hazards.

Fort Campbell consists of two general areas, the cantonment area, where office and living quarters are located, and the rear area. The rear area has public roads that cross through it and is open to the general public for recreational purposes including biking, hunting, fishing, and hiking. Under applicable Army regulations, an individual who wishes to use the rear area for recreational purposes first must apply for a permit. The Rear Area Military Police Office issues such permits. Notably, however, the Army has given no notice to the public of the necessity of or the procedure for obtaining such permits. Similarly, other Army regulations that are unavailable to the public ostensibly prohibit civilians from travelling upon unpaved, ungravelled, dirt roads in the rear area like Parkertown Road. No signs exist at the various points of entry, however, to notify the public that use of and travel across the undeveloped land is restricted. The signs that do exist at the points of entry, such as

the one that David Sumner and his friends passed on the day of the accident, omit the fact that use of and travel across the land is restricted.

Despite the Army regulations limiting access to the rear area, the Army was aware of the public's use of the area for recreation without permission. Sergeant Paul Hicks testified that the Army knew that members of the public occasionally strayed into impact areas while hiking or hunting. In fact, the Army was aware of at least one incident prior to David Sumner's accident in which a civilian was injured by stepping on a dud in an impact area. The Army at Fort Campbell regularly conducts patrols in order to keep trespassers out of the rear area. The effectiveness of these patrols, however, seems dubious. Although prior to the accident David Sumner and his friends frequently rode motorcycles around the rear area, no military officer had ever cited David Sumner or his friends for trespassing or instructed them to leave the rear area.[4]

As a result of the accident, David Sumner suffered permanent disfigurement to his face and other parts of his body, including the loss of his left eye and severe, permanent damage to his right eye. The plaintiff's overall vision is eighty-eight percent impaired. He cannot read the largest print available at his opthalmologist's office. Because of the injuries to other parts of his body, there is also a moderate chance that the plaintiff will suffer hernias or incisions in his wounds or an intestinal obstruction, any of which would require surgery.

The plaintiff suffered severe, permanent brain damage, including the loss of a portion of the frontal lobe of his brain. This brain damage has caused significant cognitive deficits, such as severe impairment of mental capacity, attention span, auditory processing, retention skills, spatial orientation skills, problem solving skills, reasoning and immediate memory. These cognitive

---

**4.** According to testimony at trial, David Sumner once encountered Army personnel putting up barbed wire while riding on a paved road, at which time an officer instructed him that he could not proceed down the dirt road. The officer, however, did not issue a citation to nor inform David Sumner that he was not permitted in the rear area without a permit.

deficits combined with his visual impairment will most likely prevent David Sumner from ever being gainfully employed. The injuries to the brain leave him subject to a high risk of seizures. Not surprisingly, David Sumner also has suffered severe psychological trauma, depression and anxiety stemming from the accident. The plaintiff will require daily medication for the rest of his life.

Prior to the accident, David Sumner was a normal young man in Stewart county. He enjoyed playing pool, riding motorcycles and driving cars. He often worked on motorcycles and cars, rebuilding their motors and performing maintenance on them. He liked this type of recreation and was good at it.

The parties have stipulated that the reasonable and necessary medical expenses incurred in relation to David Sumner's accident were $157,361.97. At trial, the plaintiff's experts estimated that the plaintiff's future medical and medically related expenses will be $636,000.00. Additionally, the experts estimated that David Sumner will incur $186,170.00 in expenses as a result of his diminished ability to care for himself. The plaintiff also put on proof that showed, due to the accident, David Sumner will probably suffer approximately $1,670,940.00 in diminished earning capacity over the span of his life.

## II. ANALYSIS

### A. *Federal Tort Claims Act*

 David Sumner seeks to recover damages from the Government under a negligence theory. The United States, as sovereign, is immune from suit save as it consents to suit through congressional authorization. *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). In 1946, Congress passed the Federal Tort Claims Act (FTCA) which provided a judicial remedy

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the

> United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). Congress intended, however, that the FTCA constitute only a limited waiver of the doctrine of sovereign immunity. *Peterson v. United States*, 694 F.2d 943, 944 (3d Cir.1982); *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976). The FTCA reflects an acceptance of the Government of liability under circumstances that would bring private liability into existence, not the creation of new causes of action. *Freres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 157, 95 L.Ed. 152 (1950) (Government not liable to serviceman for injuries arising out of course of military duty). The FTCA does not create federal substantive causes of action, but merely provides a procedural remedy for state tort claims that would otherwise be barred by sovereign immunity. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 589, 7 L.Ed.2d 492 (1962); *see also* 2 Lester S. Jayson, Handling Federal Tort Claims § 245 (1991).

### B. *Discretionary Function Exception*

 One important aspect of the limited waiver of sovereign immunity provided for by the FTCA is the discretionary function exception embodied in 28 U.S.C. § 2680. While 28 U.S.C. § 1346(b) gives jurisdiction to the United States district courts over federal tort claims, section 2680(a) provides that such jurisdiction shall not apply to

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). Thus, if a claim falls within the discretionary function exception,

a district court is without jurisdiction to hear it.

Although the discretionary function provision is not a shining example of grammatical clarity, courts over the decades have delineated its meaning. The Supreme Court has noted that the legislative history of the exception indicates that it was designed to prevent the propriety of a governmental discretionary decision from being challenged through the medium of a damage suit for tort. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) ("the specific exception was added to make clear that the [FTCA] was not to be extended into the realm of the validity of legislation or discretionary administrative action"); *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 963, 97 L.Ed. 1427 (1953). In other words, the purpose of the discretionary function exception is to prevent judicial "second guessing" of governmental actions and decisions based on considerations of public policy. *United States v. Gaubert*, — U.S. —, 111 S.Ct. 1267, 1273–74, 113 L.Ed.2d 335 (1991); *see also Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). If the governmental decision in question is grounded in social, economic, and political considerations, then it is the type of policy decision that Congress intended the discretionary function exception to protect. *S.A. Empresa*, 104 S.Ct. at 2765. The basic inquiry "is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." *Id.* at 2764.

The Court of Appeals for the District of Columbia has noted that the discretionary function exception reflects Congress' concern with protecting the Government from liability that would seriously handicap government operations. *Gray v. Bell*, 712 F.2d 490, 506 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). The appeals court further stated:

> The modern policy basis justifying sovereign immunity from suit has three principle themes. First, and most important, under traditional principles of separation of powers, courts should refrain from reviewing or judging the propriety of the policymaking acts of the coordinate branches. Second, consistent with the related doctrine of official immunity, courts should not subject the sovereign to liability where doing so would inhibit vigorous decision making by government policy makers. Third, in the interest of preserving public revenues and property, courts should be wary of creating huge and unpredictable governmental liabilities by exposing the sovereign to damage claims for broad policy decisions that necessarily impact large numbers of people.

*Id.* at 511; *see also Beins v. United States*, 695 F.2d 591, 600 (D.C.Cir.1982) (the exception applies only where the question is not negligence but social wisdom, not due care but political practicality, not reasonableness but economic expediency).

The Sixth Circuit has held that "once the government makes a policy decision protected by the discretionary function exception, it must proceed with due care in the implementation of that decision." *Caplan v. United States*, 877 F.2d 1314, 1316 (6th Cir.1989). Similarly, other courts have held the government to a standard of due care, once it has exercised discretion to operate a lighthouse, *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 126–27, 100 L.Ed. 48 (1955), to construct a stairwell, *Greene v. United States*, 745 F.Supp. 1486, 1492 (E.D.Mo.1990), or to conduct repairs, *Price v. United States*, 530 F.Supp. 1010, 1017–18 (S.D.Miss.1981). Also in a similar vein, since the first clause of the discretionary function exception bars suits arising out of the conduct of government officials in the execution of statutes or regulations with due care, the failure of an official to execute a statute or regulation with due care is not protected by the exception. *Hatahley v. United States*, 351 U.S. 173, 76 S.Ct. 745, 751, 100 L.Ed. 1065 (1956); *Jayvee Brand, Inc. v. United States*, 721 F.2d 385, 389 (D.C.Cir.1983) ("the exception does not apply when a

government employee fails to follow obligatory procedures in applying a rule that itself is an exercise of discretion").

■ Therefore, in the instant case, the Court's inquiry cannot go to whether the United States Army's regulations were the prudent and proper means to safeguard the public from impact areas across the country. The Court is also without jurisdiction to analyze whether the administrators at Fort Campbell acted properly in deciding that in order to safeguard the public from impact areas only the minimum standards required by Army regulations were necessary in light of the social and economic circumstances of the surrounding counties. To do so would be to violate Congress' intent to shield such governmental policy decisions from judicial review. The Court, however, does have jurisdiction to examine the government's exercise of due care once it undertook the implementation of the Army regulations. The Fort Campbell personnel's execution, or lack thereof, of the Army's policy decision to require the dissemination of warning information through signs, the local news media, and education programs for school children did not involve considerations of social, economic or political policy, and therefore are within the scope of a district court's jurisdiction under the FTCA.

### C. *Negligence in Tennessee*

Since the FTCA was not intended to create new substantive causes of action, section 1346(a) requires the Court to apply the Tennessee law of negligence to determine whether the government is liable, as a private individual would be, for its acts or omissions in this case. *See Richards v. United States*, 82 S.Ct. at 591.

### 1. The Recreational Use Statute

■ In this case, because the rear area of Fort Campbell was provided to the public for recreational use, the applicable standard of care to which the Army is held is found in Tennessee's recreational use

statute. *See* Tenn.Code Ann. § 70–7–101 (term "land" used in statute means all real property, owned by the government or privately, except residences). That statute reads in pertinent part;

> Landowners Duty of Care—*The landowner, lessee, occupant, or any person in control of such land or premises shall owe no duty of care to keep such land or premises safe for entry or use by others for such recreational activities as* hunting, fishing, trapping, ... *hiking, sightseeing,* ... [etc.,] nor shall such landowner be required to give any warning of hazardous conditions ... *to any person entering on such land for such purposes, except as provided in § 70–7–104.*

Tenn.Code Ann. § 70–7–102 (emphasis added). Section 70–7–104 provides:

> Conditions Under Which Liability is Unaffected—*This chapter does not limit the liability which otherwise exists:*
>
> *(1) for gross negligence, willful or wanton conduct which results in a failure to guard or warn against a dangerous condition,* use, structure or activity; ...

Tenn.Code Ann. § 70–1–104 (emphasis added). Under these provisions, since the United States is the landowner of the rear area of Fort Campbell,[5] it owes no duty of care to people on the property for recreational purposes, unless a dangerous condition exists, under which circumstances, it will be held liable only for gross negligence, willful or wanton conduct. *See Cagle v. United States*, 937 F.2d 1073, 1075 (6th Cir.1991) (Merritt, C.J.) (applying Tennessee recreational use statute to battlefield in national military park with cannon). Since the unexploded dud ordnance in Fort Campbell's impact areas obviously constitute a dangerous condition, the question is whether the Army's conduct amounted to gross negligence.

---

**5.** For cases applying state recreational use statutes to the United States as a landowner under the FTCA, see *George v. United States*, 735 F.Supp. 1524, 1535 (M.D.Ala.1990) (applying

Alabama recreational use statute) and *Lebeter v. United States*, 750 F.Supp. 322 (N.D.Ill.1990) (applying Michigan recreational use statute).

### 2. Gross Negligence·

Tennessee law defines gross negligence in the following manner: "Gross negligence is not characterized by inadvertence. It is a negligent act done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." *Ruff v. Memphis Light, Gas and Water Divisions,* 619 S.W.2d 526, 528 (Tenn.App. 1981); *see also Davidson v. Power Board of City of Pulaski,* 686 S.W.2d 581, 586 (Tenn.App.1984) (negligence per se is not gross negligence unless a reckless disregard for the safety of others). Courts in Tennessee have also held that "An act done by one charged with an ordinary degree of · care might be only simple negligence, but when done by one dealing in a dangerous, lethal instrumentality, that same act could constitute gross negligence." *Phelps v. Magnavox Company of Tennessee,* 497 S.W.2d 898, 906 (Tenn.App.1972).[6]

Taking into account the fact that the Army considered the south impact area to be a "never cross" type area due to the potentially lethal unexploded duds known to be in the area, the Court finds that the Army's failure to properly maintain warning signs in the area constituted gross negligence. Despite the highly dangerous nature of the impact areas, the Army inadequately designed and maintained the warning signs. Even as originally designed, they were illegible from a distance of approximately fifty feet. The Army placed the signs within the boundaries of the impact area instead of on the boundaries. Further, the Army neglected to promptly replace the signs when they faded or when they were stolen. In light of the lethal nature of the impact areas, such conduct constituted a reckless disregard of the public who used the rear area of Fort Campbell from which a· conscious indifference to potential consequences can be inferred.

### 3. Negligence Per Se

Under Tennessee law, the Army's failure to follow the regulations concerning warning signs and education of the public on impact area hazards also amounted to negligence per se.[7] A breach of duty imposed by statute or regulation is negligence per se if the party injured is a member of the class of persons that the statute or regulation was intended to protect. *Alex v. Armstrong,* 215 Tenn. 276, 385 S.W.2d 110, 114 (Tenn.1964); *Traylor v. Coburn,* 597 S.W.2d 319, 322 (Tenn.App. 1980); *see also Griffin v. United States,* 500 F.2d 1059, 1069–70 (3d Cir.1974) (lower court applied doctrine of negligence per se and court of appeals stated that failure to adhere to regulations was not within the discretionary function exception). Here, the Army regulations were intended to protect a class, namely the public in the counties surrounding Fort Campbell, from the lethal dangers inside the impact areas, and David Sumner was a member of that class.

The Government cites *Nevill v. Tullahoma,* 756 S.W.2d 226, 233 (Tenn.1988), for the proposition that Tennessee courts distinguish between legislatively authorized statutes and regulations, and internal agency ordinances, and that the latter do not support findings of negligence per se. The facts of *Nevill,* however, involved internal

---

**6.** Similarly, the Restatement (Second) of Torts defines gross negligence or recklessness as follows:

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, *but also that such risk is substantially greater than that which is necessary to make his conduct negligent.*

2 Restatement (Second) of Torts § 500 (1965) (emphasis added).

**7.** Of course, ·the Court recognizes that negligence per se establishes only simple negligence and, without further showing, not gross negligence. *Davidson v. Power Board of City of Pulaski,* 686 S.W.2d 581, 586 (Tenn.App.1984) In the instant case, though, as discussed above, the plaintiffs have demonstrated that the Government's conduct, in light of the circumstances, constituted gross negligence. Therefore, the Court emphasizes the fact that it discusses negligence per se only in support of its overall finding of gross negligence.

policies of the local police that were not directed at the protecting the public. In this case, on the other hand, the pertinent Army regulations are national in scope and specifically state as their purpose the protection of army personnel and the public. Therefore, the Army's failure to comply with the Army regulations that required adequate warning signs and the dissemination of information through the media regarding the hazardous impact areas constituted negligence per se.

### 4. Proximate Cause

 The next issue is proximate causation. In Tennessee, proximate cause requires that harm must have been foreseeable. *Ford Motor Co. v. Eads*, 224 Tenn. 473, 457 S.W.2d 28, 32 (1970). In addition, proximate cause means cause in fact or that "but for" the actor's negligence the injury would not have been inflicted. *Shouse v. Otis*, 224 Tenn. 1, 448 S.W.2d 673, 676 (1969). In order to establish proximate cause, a plaintiff must introduce evidence that affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the injury. *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856, 861 (Tenn.1985).

 The Army knew of the extreme danger connected with the unexploded duds on the impact areas within the rear area of Fort Campbell and knew of the public use of the rear area for recreational purposes. Thus, the injuries to a member of the public using the rear area for recreational purposes was foreseeable. Indeed, the Army admitted to having knowledge of at least one other accident involving dud ordnance in an impact area at Fort Campbell.

 If the Army had used the local news media and programs to educate school children to warn the local communities about the extreme hazard to life and limb that the unexploded duds posed to users of the rear area, as required by Army regulations, it is reasonable to conclude that David Sumner's awareness of the danger probably would have prevented him from entering the impact area with his

brother and Junior Miles. Also, compliance with the army regulation requiring a legible sign on the boundary of the south impact area would have served to communicate the imminent danger of unexploded duds and supplement the dissemination of warnings through local media and education programs, and also probably would have prevented David Sumner from entering the impact area. Therefore, since the injuries to a civilian like David were foreseeable, and the Army's grossly negligent and negligent per se acts were a cause in fact of his actual injuries, the Army's negligence was the proximate cause of David Sumner's injuries.

### D. *Affirmative Defenses*

 Finally, the Government asserts that David Sumner cannot recover because he was contributorily negligent and such conduct bars recovery under Tennessee law. Alternatively, the Government contends that his recovery is barred by the doctrine of assumption of risk. It is true that proximate contributory negligence and assumption of risk generally bar recovery in Tennessee. *See DeRossett v. Malone*, 34 Tenn.App. 451, 239 S.W.2d 366, 376–77 (1950) (contributory negligence); *Talley v. Curtis*, 23 Tenn.App. 181, 129 S.W.2d 1099, 1101 (1939) (assumption of risk). Since Tennessee courts view these doctrines as distinct, the Court addresses them separately. *See Obrien v. Smith Brothers Engine Rebuilders*, 494 S.W.2d 787, 793–94 (Tenn.Ct.App.1970).

### 1. Contributory Negligence

 Contributory negligence is "a want of ordinary care upon the part of the person injured by the actionable negligence of another, combining and concurring with that negligence and contributing to the injury as a proximate cause thereof, without which the injury would not have occurred." *Memphis State Railroad v. Roe*, 118 Tenn. 601, 102 S.W. 343 (1907). David Sumner's actions on the day of the accident do not indicate such a want of ordinary care on his part. Although at trial he was unable to recall the events that lead up to the acci-

dent, it appears from other evidence that he was merely following his older brother and Junior Miles on an expedition to examine abandoned military vehicles in the rear area of Fort Campbell. His conduct had been implicitly condoned by the Army's prior acquiescence to individuals in the rear area, and therefore, there was no reason for him to believe that there was anything inherently dangerous in his conduct that day. None of it reflected a particular imprudence, especially given his apparent lack of understanding, discussed further below, of the dangers that awaited him.

### 2. Assumption of Risk

The doctrine of assumption of risk bars a plaintiff's claim if the defendant shows the plaintiff's knowledge of the danger, appreciation of the danger, and voluntary exposure of the danger. *O'Brien*, 494 S.W.2d at 793. The Court also declines to apply this doctrine to the case at bar. No direct proof put on at trial indicated that David Sumner had knowledge or appreciation of the danger involved in walking on the south impact area. The Government contends vigorously that he did. The Government points to Junior Miles' testimony at trial that he knew what an impact area was before the day of the accident and to the fact that David and his friends passed the warning sign on their way toward the abandoned vehicle and saw shells on the ground around the vehicle. Junior Miles testimony, however, contradicted an earlier written statement he had made. Even if Junior Miles understood that an impact area was a target area, that does not mean he appreciated the existence or potential danger of unexploded duds in the area. Further, the Court would not impute any of Junior Miles' possible knowledge to David Sumner who was younger and participated in this expedition as a follower. Finally, the presence of the shells on the ground did not provide notice to the Sumners and Junior Miles of the presence or danger of unexploded duds, and, and discussed above, the warning sign was ineffective in this regard as well.

### E. *Damages*

In a personal injury tort case, Tennessee law recognizes damages for bodily injury, pain and suffering, medical and other related expenses, loss of earning capacity, and permanent disability. *Yellow Cab Co. of Nashville v. Pewitt*, 44 Tenn. App. 572, 316 S.W.2d 17, 22 (1958). Additionally, a plaintiff may recover for impairment of the enjoyment of life. *Martin v. Southern Railroad Co.*, 225 Tenn. 77, 463 S.W.2d 690, 691 (1970). The amounts should not only reflect suffering prior to trial but also the suffering the plaintiff will likely suffer afterward. *Waller v. Skeleton*, 31 Tenn.App. 103, 212 S.W.2d 690, 700 (1948). In determining the amount of damages, a court should consider the nature and extent of the injuries, suffering, expenses, diminution of earning capacity, inflation, age expectancy of life, and the amounts awarded in similar cases. *Loftis v. Finch*, 491 S.W.2d 370, 371 (Tenn.App. 1972).

In the instant case, the plaintiff has demonstrated damages in the amounts of $157,-361.97 for medical expenses, $636,000.00 in future medical and medically related expenses, $186,170.00 in expenses due to the plaintiff's diminished capacity to care for himself, and $1,670,940.00 in lost earnings capacity. All these figures take into account inflation and the plaintiff's age expectancy. With regard to the more abstract, but no less important, damages for bodily injury, pain and suffering, and loss of enjoyment of life, the Court finds that the evidence sustains an award of damages in the amounts of $1,000,000 for bodily injuries, $1,000,000 for pain and suffering, and $2,000,000.00 for loss of enjoyment of life. The Court views these amounts as justifiable in light of other damage awards in personal injury cases. In total, the judgment against the Government is $6,650,-471.97.

### III. CONCLUSION

For the reasons stated above, after hearing trial on this matter, the Court ENTERS judgment in favor of the plaintiff in the amount of $6,650,471.97. An order consist-

ent with the above reasoning and result will be entered simultaneously with this memorandum.