RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0204P (6th Cir.)
File Name: 01a0204p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JANET EDWARDS,
        *Plaintiff-Appellant,*

        *v.*

TENNESSEE VALLEY
AUTHORITY,
        *Defendant-Appellee.*

No. 00-5281

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 99-00418—James H. Jarvis, District Judge.

Argued: May 2, 2001

Decided and Filed: June 26, 2001

Before: JONES, SILER, and GILMAN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Linda G. Welch, LINDA G. WELCH &
ASSOCIATES, Knoxville, Tennessee, for Appellant. Edwin
W. Small, TENNESSEE VALLEY AUTHORITY, Knoxville,
Tennessee, for Appellee. **ON BRIEF:** Linda G. Welch, Gary
T. Dupler, LINDA G. WELCH & ASSOCIATES, Knoxville,
Tennessee, for Appellant. Edwin W. Small, Thomas A.

Robins, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  In this wrongful death action, Janet Edwards seeks to recover compensatory and punitive damages from the Tennessee Valley Authority (TVA), a federal agency, for the drowning death of her 17-year-old son, Garry Levi Farner.  Farner drowned when he slipped from the rocky shoreline and fell into the Tennessee River near Fort Loudoun Dam, which is maintained and operated by TVA.  Edwards acknowledges that TVA had posted numerous warning signs around the dam, but claims that TVA violated the applicable duty of care owed to her son by failing to adequately maintain existing safety measures and failing to take additional measures to provide for the safety of the public.  TVA contends that its safety measures involved discretionary functions for which it cannot be held liable.  Summary judgment was granted in favor of TVA.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  The accident

On the day of the accident, Farner and his two friends, Shawn Killebrew and Chad White, went to fish at the Fort Loudoun Dam Reservation in eastern Tennessee.  They originally fished from the rocks along a portion of the riverbank well below where the turbines and the powerhouse are located.  According to Killebrew, they decided to proceed from their first location to a location that was closer to the dam because Farner had caught fish there on a previous occasion.  They had to go through a gap between a chain-link fence and the water's edge in order to enter the upstream shoreline area, approximately 80 yards from the dam.

## III.  CONCLUSION

For all the reasons set forth above, we find that the actions of TVA fell within the discretionary function exception to tort liability.  Despite the tragic accident that took the life of Garry Levi Farner, we find no basis to hold TVA responsible.  We therefore **AFFIRM** the judgment of the district court dismissing Edwards's claim.

*Rosebush*, 119 F.3d at 441 (citation and internal quotation marks omitted).    This court in *Rosebush* outlined the following three types of decisions that are generally shielded from tort liability by the discretionary function exception: (1) "the proper response to hazards," (2) "whether and how to make federal lands safe for visitors," and (3) "whether to warn of potential danger." *Id.* at 443.

The record before us indicates that TVA's actions fall under both of the first two categories, thereby fulfilling the second part of the discretionary function test.    For instance, the unrebutted declaration of Brock states that

> the TVA managers responsible for the area must exercise judgment in making decisions about what specific measures TVA takes for the safety of members of the public using the shoreline area immediately below Fort Loudoun Dam.    The exercise of that judgment involves the balancing of various considerations, including the benefits of making Federal lands available for public recreation, public safety, the effectiveness of various types of warnings, aesthetic concerns, financial considerations, and environmental impact.

The optional language in TVA's "Recommendations for Water Safety Warning Devices" report further indicates that TVA left decisions regarding how to make federal lands safe for visitors up to the discretion of its managers.    As such, the decision of TVA managers is consistent with the "line of cases in which courts have ruled that where a federal agency . . . must balance competing needs when deciding how to run a federal facility, the discretionary function exception to the FTCA has been held to apply." *Rich v. United States*, 119 F.3d 447, 451 (6th Cir. 1997) (holding that the United States Army Corps's decision regarding the type of guardrail to use on a curve was within its "discretionary function").    The second part of the discretionary function test, therefore, has been fulfilled in the present case.

At some point after they entered the upstream area, Farner slipped and fell from the rocks into the "swirling water and current" created by the discharge of the water through the dam's hydroelectric turbines.    Killebrew and White tried to rescue Farner, with Killebrew using a fishing pole and White leaving to get additional help.    They were unable to save Farner.    By the time White returned with a police officer from the Lenoir City Police Department, Farner had drowned.    The officer later stated that he "tried to get the life ring [that was nearby] but the subject had moved into the turbulence and went underwater."

## B.    The physical layout of Fort Loudoun Dam

TVA maintains and operates an integrated system of multipurpose dams on the Tennessee River, one of which is Fort Loudoun Dam.    On the Fort Loudoun Dam Reservation, TVA has provided a parking lot located on a bluff about 600 yards downstream from the dam.    This parking lot is used by members of the public who desire to fish from the riverbank at the base of the bluff.    Visitors can access the riverbank by using a sidewalk that leads down from the parking lot.    Another sidewalk extends upstream along the base of the bluff for approximately 300 yards.    At this point the sidewalk ends, with the shoreline becoming steep and rocky.

A chain-link fence extends from a high concrete wall to the vicinity of the water about 80 yards from the dam.    This fence replaced another chain-link fence that was "in pieces on the rocks."    According to a signed declaration by W. Gary Brock, the Manager of Navigation and Structures Engineering in TVA's River Operations organization, the purpose of the fence was "to help convey a warning message to persons proceeding up the shoreline that the area upstream of the fence is an area of increased danger."    The declaration also stated that the fence was constructed so that a gap exists between the end of the fence and the water in order to avoid "subject[ing it] to destruction by forces imposed upon it during high-water, high-flow conditions."    The length of the gap varies according to the water level.    Finally, Brock's

declaration points out that "the short section of the chain link which extends about three feet beyond the last fence post is not anchored but is flexible such that it can be pushed by persons seeking to go around the fence . . . because of the high-water, high-flow conditions which sometimes occurs in that location."

TVA had posted numerous warning signs throughout the area near the dam. There are, for example, large billboards stating "WARNING DANGEROUS WATERS" at the end of the parking lot nearest the dam and on the shore about 100 yards from the dam. A large sign at the bottom of the sidewalk down the bluff declares that "STATE LAW REQUIRES BOATERS TO WEAR A LIFE JACKET FROM THIS POINT UPSTREAM TO DAM." Smaller signs at various locations along the sidewalk at the base of the bluff and the rocky shoreline state "DANGER WATER MAY RISE RAPIDLY WITHOUT WARNING" and "STATE LAW REQUIRES BOATERS TO WEAR LIFE JACKET IN THIS AREA." Finally, two warning signs are posted on the chain link fence, one stating "DANGER KEEP OUT" and the other stating "RESTRICTED AREA KEEP OUT."

Mounted in a box on the railing of the powerhouse transformer deck above the area where Farner fell into the river was a circular floatation device (a life preserver). This device, however, was not marked in any way, nor could it be seen by persons using the shoreline.

## C.  Procedural background

On August 9, 1999, Edwards filed her wrongful death action against TVA in the United States District Court for the Eastern District of Tennessee. TVA responded by filing a motion to dismiss or for summary judgment. Edwards filed a brief in reply, but did not seek discovery through either formal or informal means, and did not file a Rule 56(f) affidavit for a continuance pending further discovery. *See* Fed. R. Civ. P. 56(f).

Nor did TVA's placement of the circular floatation device near the area where Farner drowned indicate that TVA had adopted the device as a mandatory safety procedure. The device was located far above the shoreline vertically, so that even frequent users of the shoreline were unaware of its presence in the area. Also, the box containing the device contained no markings to indicate the nature of its contents. As such, TVA's actions fail to demonstrate that it adopted a mandated requirement to provide public access to the floatation device, or even notice of its existence.

In *Rosebush v. United States*, 119 F.3d 438 (6th Cir. 1997), this court found that the Forest Service had no mandatory regulations requiring it to warn of the dangers of a fire pit, despite the fact that a section of the United States Forest Manual required the Forest Service to "[i]mmediately correct high-priority hazards that develop or are identified during the season or close the site." *Id.* at 441 (quoting Forest Service Manual § 2332.1 (1993), and holding that the discretionary function exception exempted the Forest Service from liability when a sixteen-month-old child fell into a fire pit at a Forest Service campground in the Hiawatha National Forest). The applicable regulations "did not mandate that the Forest Service maintain its campsites and fire pits in any *specific* manner. Accordingly, the conduct of the Forest Service in making these decisions was within the discretionary function exception . . . ." *Id.* at 442 (emphasis added). The same analysis is equally applicable to TVA's decisions to leave unanchored the part of the fence extending to the water's edge and to place an unmarked floatation device on the transformer deck.

### 2.  *Whether the discretionary function exception was designed to shield TVA's acts*

Once a court has concluded that an agency has no mandatory policy regarding a particular course of action, the second step of the discretionary function test is to determine whether "the challenged conduct is of the kind that the discretionary function exception was designed to shield."

a legible distance." *Summer*, 794 F. Supp. at 1362 (quoting Army Reg. 385-63 ¶ 2-8(f)).

TVA's actions in the present case, on the other hand, fulfill the first requirement of the discretionary function test because the evidence in the record demonstrates that TVA has not adopted any requirement mandating that it maintain the area around the shoreline in a specific manner. Both *Lyons* and *Sumner*, therefore, are distinguishable from this case. TVA's own report, titled "Recommendations for Water Safety Warning Devices at Tennessee Valley Authority Dams," examines the safety hazards of various TVA dams. It contains no section discussing specific access restrictions or safety recommendations. In the section relating to Fort Loudoun Dam, the report discusses warning measures only for the dam's spillway area, a part of the dam not involved in the present case. Subsequent pages describe various considerations regarding the generalized public hazards involved with dams. The "Recommendations" section points out that "[i]n the past, TVA policy has centered on a strong 'sign and education' program," and concludes with suggestions for various warning systems, using permissive language such as "it is recommended" and "either post, refurbish, or replace signage."

In addition, other statements in the record support TVA's contention that it has adopted no mandatory access or safety requirements regarding the shoreline area. Brock, the Navigation and Structures Engineering Manager, attested that "TVA does not have, and is not subject to, any mandatory policy or procedure requiring safety warnings or measures to protect members of the public using the shoreline area immediately below Fort Loudoun Dam." Even the affidavits submitted by Edwards state that "TVA officials do not try to keep people out of [the shoreline] area and do not make people leave that area when they are fishing." Rather, the statements in the record demonstrate that TVA limited its role to warning of the dangers in entering the shoreline area rather than attempting to prevent entry or to implement specific safety procedures.

Although she did comment in her brief that "[f]urther discovery would be needed to inquire into which regulations kept by TVA would apply in this case," Edwards took no steps to act on this comment. The district court granted summary judgment in favor of TVA, dismissing Edwards's complaint on the basis that TVA was shielded from tort liability by the "discretionary function exception" for government agencies. This timely appeal followed.

## II.  ANALYSIS

### A.  Standard of review

We review de novo the district court's grant of summary judgment. *See, e.g.*, *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists only when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

### B.  Application of the discretionary function exemption

TVA is a "wholly-owned corporate agency and instrumentality of the United States." *Hill v. United States Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir. 1995). One of TVA's functions as an instrumentality of the United States is the maintenance of an integrated system of multipurpose dams, including Fort Loudoun Dam, on the Tennessee River. *See Tennessee Elec. Power Co. v. TVA*, 306 U.S. 118, 134 (1939). As provided for in the TVA Act, TVA "[m]ay sue or be sued in its corporate name." 16 U.S.C. § 831c(b). Courts have interpreted this language as "making the TVA liable to

suit in tort, subject to certain exceptions." *United States v. Smith*, 499 U.S. 160, 168-69 (1991) (citing cases from the Sixth and Eleventh Circuits).

The crucial question in this case is whether TVA's actions fall under one of these exceptions to tort liability. In addressing these exceptions, this court has held that "in certain limited situations the TVA is exempt from liability arising out of the exercise of certain wholly governmental functions, where the TVA acts solely as the Government's agent and where the United States itself would not be liable." *Queen v. TVA*, 689 F.2d 80, 86 (6th Cir. 1982). "This 'nonliability' doctrine is applied when the subject governmental function is discretionary." *People's Nat'l Bank of Huntsville v. Meredith*, 812 F.2d 682, 685 (11th Cir. 1987) (applying the discretionary function exception to TVA).

TVA contends that it is exempt from liability for the death of Farner because it was acting within its discretion as a governmental entity in determining appropriate safety measures regarding the public's access to the waters around Fort Loudoun Dam. A two-part test has been established by the Supreme Court in deciding whether the discretionary function exception applies to the actions of a governmental entity. *See United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). "The first part of the test requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice." *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (citing *Gaubert*, 499 U.S. at 322-23). If the governmental entity has such a mandatory policy, then "the discretionary function exception does not apply because there was no element of judgment or choice in the complained of conduct." *Id.* On the other hand, if there is no mandatory policy, the court must then determine whether "the challenged conduct is of the kind that the discretionary function exception was designed to shield." *Id.* (citations and internal quotation marks omitted).

### *1. Whether TVA's acts violated a mandatory policy*

Edwards argues that the discretionary function exception does not apply because TVA had adopted mandatory policies that it failed to follow. She cites two cases where courts have held that the discretionary function exception was not a bar to examining the government's exercise of due care once it undertook the implementation of certain regulations. *See Lyons v. TVA*, No. 87-5309, 1988 WL 12227, at *1 (6th. Cir. Feb. 16, 1988) (unpublished table decision) (holding that TVA could be liable for injuries sustained in a car accident resulting from TVA's failure to display ice-warning signs on a bridge in violation of its own policy); *Sumner v. United States*, 794 F. Supp. 1358, 1366-70 (M.D. Tenn. 1992) (holding that the Army could be liable for the injuries to a civilian wounded by an exploding dud on the base where the Army failed to provide required warning signs near the range). According to Edwards, TVA here, like TVA in *Lyons* and the Army in *Sumner*, "undertook the responsibility and the duty of denying the general public access to this shoreline area." Edwards points to TVA's "erection of fences and attachment of a lifesaving floatation ring" to support her argument.

What the courts found actionable in both *Lyons* and *Sumner*, however, was the government's violation of its own specific policies and regulations regarding warning signs, not the violation of some generalized, implied duty. *See Lyons*, 1988 WL 12227, at *1; *Sumner*, 794 F. Supp. at 1366. In *Lyons*, TVA violated a "policy, instituted in 1982, instruct[ing] TVA officials patrolling the bridge to deploy ice warning signs when they discovered ice during the course of their patrols or if conditions warranted deployment." *Lyons*, 1988 WL 12227, at *1. Likewise, the Army in *Sumner* had adopted specific regulations providing that "the boundaries of all range areas adjacent to roadways and points of entry or along the outside limits of ricochet areas . . . will be posted with permanent signs. They will be placed at 200 meter intervals or less, or in a way that will ensure that a person cannot enter the range without seeing at least one sign within