**FILED**

**November 6, 2015**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time: 11:10 AM**




# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT JACKSON

| | |
|---|---|
| Richard Ballew, <br>       Employee, <br> v. <br><br> Shomaker Lumber Co., Inc., <br>       Employer, <br> And <br><br> Tennessee Forestry Ass'n, <br> Selective Workers' Compensation <br> Insurance Group, <br>       Insurance Carrier/TPA. | Docket No.: 2015-07-0020 <br><br> State File Number: 73518-2014 <br><br> Judge Allen Phillips |

## COMPENSATION HEARING ORDER FOR PERMANENT PARTIAL DISABILITY AND MEDICAL BENEFITS

This matter came before the undersigned workers' compensation judge for a Compensation Hearing on October 14, 2015, pursuant to Tennessee Code Annotated section 50-6-239 (2014). Mr. Ballew requests permanent partial disability and future medical benefits. The legal issues are the intoxication defense of Tennessee Code Annotated section 50-6-110(c) (2014) and, dependent upon resolution of that defense, the extent of Mr. Ballew's permanent disability and entitlement to future medical benefits. For the reasons set forth below, the Court finds the intoxication defense inapplicable and, accordingly, that Mr. Ballew is entitled to permanent partial disability and future medical benefits.

### History of Claim

For approximately eight years, Mr. Ballew operated the "head-saw" at Shomaker. The head-saw is a large machine that, in addition to its blade, features a spinning wheel that turns logs before cutting them. The wheel has "teeth," which grasp the logs as the wheel spins. The saw requires two attendants for operation; the sawyer sits in the cab of

1

the machine to operate the controls and the off-bearer manually manipulates the logs. On September 15, 2014, Mr. Ballew was the off-bearer and Mr. James Osment was the sawyer.

At approximately mid-day, the two men noticed what appeared to be hydraulic fluid leaking from the machine. Shomaker's protocol requires sounding a horn to summon maintenance personnel. Mr. Osment recalls sounding the horn; Mr. Ballew does not recall hearing it. However, the two men agree that maintenance personnel did not come to the machine.

Mr. Osment stopped the spinning wheel and Mr. Ballew crouched to observe the area of leaking fluid. In so doing, he bent at the waist and placed his right hand on a steel beam that supports the right side of the machine. His left hand rested on a steel beam approximately eighteen- to twenty-four inches higher than his right and directly above the log-turning wheel. He wrapped the fingers of his left hand around the beam, leaving a space of approximately one- to one-and one-half inches of clearance between the wheel and the beam.

The two men dispute the subsequent events. Mr. Ballew states he was looking at the area of the fluid leak when Mr. Osment triggered the machine, causing the wheel to turn. Mr. Osment recalls Mr. Ballew first making a motion with his right hand as if to say "lift" the wheel for a more direct view of the underside of the machine. Mr. Ballew then, according to Mr. Osment, made a circular motion with his right index finger, signaling Mr. Osment to spin the wheel. When Mr. Osment spun the wheel, one of the wheel's teeth amputated the tips of Mr. Ballew's left middle and ring fingers. Mr. Osment stated he would not have turned the wheel if Mr. Ballew had not motioned him to do so. He further testified that, if Mr. Ballew had placed his hand and fingers a few inches farther to the right, then the accident would not have occurred because his fingers would not have been above the wheel. However, he also testified Mr. Ballew acted as he always did on the date of injury and did not appear impaired.

Ronnie Shomaker, one of the owners, carried Mr. Ballew to McKenzie Regional Medical Center. The initial note indicates an arrival time of 12:40 PM. (Ex. 2 at 6.) At 12:55 PM, hospital records indicate the intravenous administration of 5mg of morphine. *Id.* at 7. Mr. Ballew also received two other medications via the IV, a tetanus shot, and bandages were placed on his fingers. *Id.* Though the records do not indicate who might have been present, Mr. Ballew admitted on cross-examination that, at some point, his sister came to the treatment room to visit.

Martha Shomaker, the other owner, visited Mr. Ballew at the hospital. She testified he appeared to be in pain, but there were no indications of anything being "awry." At one point, although not clear when, she also saw a female identified as Mr. Ballew's sister. His sister went to Mr. Ballew's treatment room on two occasions. After

the first visit, his sister went into a bathroom and then exited the building to smoke. While outside, Ms. Shomaker observed his sister visit with an unidentified male in the parking lot. His sister returned inside and again went to her brother's treatment room.

At approximately 2:15 PM, Mr. Ballew walked to another room for a urinalysis drug screen. Mr. Ballew testified that the technician inspected the pants pockets of his "cargo shorts" on both the left and right legs by "squeezing" the pockets to check their contents. He claims to have carried only cigarettes, a lighter and his wallet. The technician gave him a specimen cup and directed him to enter the bathroom where he produced a urine sample with great difficulty due to his bandaged left hand. He then opened the door and handed the cup to the technician.

Ms. Shomaker walked with Mr. Ballew to the room where the drug test was performed. She saw the technician hand Mr. Ballew a specimen cup and saw Mr. Ballew enter and leave the bathroom. She testified the technician did not touch Mr. Ballew before he entered the bathroom.

Ms. Kim Dubruiel testified she was the phlebotomist who administered the drug test. She testified she remembered Mr. Ballew because of the traumatic nature of his injuries and the bandages on his left hand. She also testified that she did not search, pat down or check Mr. Ballew's pockets. She explained searches were not within the hospital's protocol. She only asked him if he had anything in his pockets and checked the restroom for contraband. She did assist Mr. Ballew with writing his name on the sample form, a task usually performed by the patient, because of his bandaged left hand. She noted Ms. Shomaker was also present when Mr. Ballew was tested.

Ms. Dubriel added no additional remarks on the required chain of custody form, but noted in eight years of performing specimen collections, she had never marked additional comments on the form. Additionally, she did not mark "observed" on the form because she did not watch Mr. Ballew actually provide the sample. She did note that he "took longer than normal" in the restroom and that the sample was in the lower range of normal temperature. Shomaker asked if she would have been able to determine if Mr. Ballew had a test tube of urine concealed in his waist band or strapped to his leg, to which she replied in the negative. The Court noted the incredulous expression on Mr. Ballew's face at this point of her testimony.

Two or three days after the accident, Ms. Shomaker's daughter-in-law received an anonymous phone call from a male who identified himself only as a hospital employee. He refused to identify himself further for fear of losing his job. He said Shomaker should reconsider the drug test because Mr. Ballew's sister "gave [Mr. Ballew] something." At that point, Shomaker contacted its carrier.

Ms. Karen Portugues was the adjuster assigned Mr. Ballew's case. Upon receipt of

3

the claim, she paid all medical benefits. After receiving word of the anonymous phone call, she compared the medical records to the drug screen and noted the negative findings despite the morphine administration. This prompted her to retain a toxicologist to review the records.

Dr. Howard Taylor is a forensic toxicologist with thirty-plus years of experience. In his expert opinion, the urinalysis should have revealed morphine, an opiate, because Mr. Ballew received morphine one hour and twenty-five minutes prior to the test. His report noted no morphine in the sample. His testimony was that the test was negative because it showed a morphine level below the amount defined as positive by the Tennessee Drug-Free program's definition of a positive test. He also noted that a person can conceal a container of urine on their person for an extended period while keeping the sample at an acceptable temperature range for testing. Upon receipt of his report, Shomaker's carrier issued a notice of denial in December 2014.

While the carrier investigated the claim, Mr. Ballew received medical care from Dr. Michael Dolan. Dr. Dolan performed exploratory surgery on September 16, 2014, the day after the injury, cleanly amputating the damaged middle finger to the level of the distal joint. He repaired the ring finger, but there was residual damage to the nail bed area. Dr. Dolan treated Mr. Ballew for approximately three months until he released him on December 14, 2014, at maximum medical improvement. He assessed 5% impairment to the body as a whole based upon detailed testing by a Licensed Occupational Therapist. He based his rating on the Diagnosis-Based model of the American Medical Association's Guides to the Evaluation of Impairment, 6th Edition ("AMA Guides"). (Ex. 3 at 105.)

Dr. Samuel Chung later evaluated Mr. Ballew at the behest of his attorney. Dr. Chung utilized the AMA Guides and arrived at an 8% to the body rating based upon the Range of Motion model. (Ex. 6 at 98.)

Shomaker terminated Mr. Ballew for what it described as "fraud." Ms. Shomaker confirmed the company was part of the Drug-Free Workplace program and it makes its employees aware of the consequences of a failed test. Mr. Ballew denied any wrongdoing, including testimony that he did not use illegal drugs, he was not under the influence of any drug, illegal or otherwise, on the date of the injury, and he had not taken any medications for a period of some years. His wife corroborated all of his assertions. Mr. Ballew obtained employment at a wage equal to or greater than the wage he earned at Shomaker.

**Findings of Fact and Conclusions of Law**

The Workers' Compensation Law shall not be remedially or liberally construed in favor of either party but shall be construed fairly, impartially and in accordance with

4

basic principles of statutory construction favoring neither the employee nor employer. Tenn. Code Ann. § 50-6-116 (2014). The employee in a workers' compensation claim has the burden of proof on all essential elements of a claim. *Tindall v. Waring Park Ass'n,* 725 S.W.2d 935, 937 (Tenn. 1987);[1] *Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). For an injury to be compensable, it must arise primarily out of and in the course and scope of employment and be identifiable by time and place of occurrence. Tenn. Code Ann. § 50-6-102(13)(A) (2014). At a compensation hearing, the employee must prove all elements of his case by a preponderance of the evidence. Tenn. Code Ann. § 50-6-239(c)(6) (2014).

*Intoxication Defense*

Shomaker argues Mr. Ballew provided a false urine sample for drug testing and, because of this fraudulent action, his claim must be denied. Specifically, the Tennessee Workers' Compensation Law provides that no compensation is allowed for an injury due to an employee's intoxication or illegal drug use. Tenn. Code Ann. § 50-5-110(a)(3) (2014). If an employer has implemented a drug-free workplace program, as did Shomaker, a positive drug test creates a presumption "that the drug or alcohol was the proximate cause of the injury." Tenn. Code Ann. § 50-6-110(c)(1) (2014). The same presumption holds true if an employee refuses to submit to a drug test. Tenn. Code Ann. § 50-6-110(c)(2) (2014).[2] An employee may rebut either of these presumptions by producing clear and convincing evidence that the drug was not the proximate cause of the injury. *Id.* "Clear and convincing evidence" is that which leaves "no serious or substantial doubt about the correctness of the conclusions drawn." *Goff v. Elmo Greer & Sons Const. Co., Inc.,* 297 S.W.3d 175, 187 (Tenn. 2009). Stated differently, the truth of the facts asserted in rebuttal must be "highly probable." *Id.*

Our Appeals Board addressed the intoxication defense in *Ellis v. A Air-One Services,* No. 2015-02-0001, 2015 TN Wrk. Comp. App. Bd. LEXIS 8 (Tenn. Workers' Comp. App. Bd. Apr. 16, 2015). In that case, the employee was injured while working for an employer who had implemented a drug-free workplace program. A post-accident urinalysis revealed the presence of methamphetamines, and the employer denied the claim based on Tennessee Code Annotated section 50-6-110(c). The employee questioned the results and submitted a subsequent hair-sample drug test that was negative. At an Expedited Hearing, the trial court found the employee rebutted the

---

[1] The Tennessee Workers' Compensation Appeals Board allows reliance on precedent from the Tennessee Supreme Court "unless it is evident that the Supreme Court's decision or rationale relied on a remedial interpretation of pre-July 1, 2014 statutes, that it relied on specific statutory language no longer contained in the Workers' Compensation Law, and/or that it relied on an analysis that has since been addressed by the general assembly through statutory amendments." *McCord v. Advantage Human Resourcing,* No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, *13 n.4 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015).

[2] The Court notes the absence of any provision specifically addressing a "false" specimen, but agrees with Shomaker's argument that producing a false specimen is legally equivalent to refusing to submit to a drug test.

presumption of intoxication. The Appeals Board affirmed, finding the only evidence proving intoxication was the refuted urinalysis. Further, the employee denied the use of illegal drugs at the time of the accident and for many years prior. Finally, "the record [was] devoid of any evidence that illegal drug use caused or contributed to [that employee's] accident." *Id.* at 6.

The Appeals Board cited two other cases addressing the presumption. In *Interstate Mechanical Contractors, Inc. v. McIntosh*, 229 S.W3d 674 (Tenn. 2007), the employee had his hand crushed when a co-employee, unaware that the employee's hand was in a position of danger, engaged a machine. A post-accident drug test revealed the presence of marijuana metabolites. As the employer was part of the Drug-Free Workplace Program, the employee was required to rebut the presumption, which at that time, required only a preponderance of the evidence standard. Our Supreme Court affirmed a finding that the employee had rebutted the presumption because there was no evidence that once the machine was engaged the employee would have had time to move his hand. Even with evidence that the level of marijuana in his system would have impaired his reaction time, there was no connection between the employee's slowed reaction time and the accident. *Id.* at 681.

In *Campbell v. PML, Inc.*, No. W2008-01539-WC-R3-WC, 2009 Tenn. LEXIS 68 (Tenn. Workers' Comp. Panel May 6, 2009), the employee suffered a partial amputation of his thumb when it was caught in a pulley. Again, the employer was part of the Drug-Free Workplace Program, and a test was positive for marijuana. The employee prevailed because: 1) his supervisor and a co-worker testified he did not appear impaired; and, 2) there was an absence of evidence concerning how the level of the drugs in his system would have affected his actions. *Id.* at *11-12.

*Absence of proof of intoxication*

The Court finds an analysis of Mr. Ballew's case fits squarely within this precedent. Dr. Taylor, the only expert witness to testify, explained the urinalysis should have shown the presence of morphine because of the rapid assimilation of the drug after an intravenous infusion one hour and twenty-five minutes before the test. Notably, Dr. Taylor conceded morphine might be in a sample, but simply below the cutoff range. He testified the Tennessee Drug-Free Workplace guidelines define any test showing a level of opiates under 2000 ng/mL as negative for morphine.[3] The only drug test in evidence

---

[3] Shomaker attempted to offer further evidence on this issue by questioning Dr. Taylor regarding his contacting the testing laboratory to obtain further information, namely that the test was completely negative for morphine. Though Tennessee Rule of Evidence 703 allows an expert somewhat wide latitude in explaining the bases of his opinions, those opinions are disallowed if "the underlying facts or data indicate a lack of trustworthiness." Any information Dr. Taylor might have gleaned from a call to the laboratory would be hearsay not subject to cross-examination regarding such issues as the laboratory's findings, the methodology used in making said findings, and the adherence to the requirements of Tennessee law on the sufficiency of testing. Accordingly, the Court excluded the proffered testimony. Regardless, the ultimate resolution of the case does not turn on consideration of the test being completely

indicates a level of opiates below 2000 ng/mL. (Ex. 1 at 1.) Thus, like *Ellis*, the Court has before it no evidence of the presence of any intoxicating substance in Mr. Ballew's body at the time of injury. More importantly, as in *Campbell*, there is no expert evidence as to the effects any intoxicant might have had on Mr. Ballew's conduct at the time of injury.

*Rebuttal of intoxication as proximate cause*

In reviewing the lay testimony, the Court first recognizes Shomaker's defense rests on a timeline of occurrences that cloak Mr. Ballew's claim in a shroud of suspicion. Specifically, Shomaker's theory is that Mr. Ballew's sister transferred a container of urine to substitute for his own. The Court thoroughly considered all of the circumstantial evidence.[4] However, the required focus of the Court's inquiry is the applicable legal standard: namely, even if the test were fraudulent, has Mr. Ballew rebutted the presumption of any illegal drug use being the proximate cause of his injury by clear and convincing evidence? In accord with the authority of *Ellis*, *McIntosh* and *Campbell*, the Court finds Mr. Ballew rebutted the presumption by that standard.

The Court notes Ms. Shomaker testified Mr. Ballew acted in a manner normal for him when she saw him at the hospital; he was "chatty" as always but not "nervous." Based on its observation of Mr. Ballew at the hearing, the Court concurs in her description of Mr. Ballew's persona. Further, Ms. Shomaker observed Mr. Ballew appeared, as one would expect, to be both in pain and limited in the use of his left hand. Dispositive to the Court's inquiry, she did not describe any behavior consistent with Mr. Ballew being under the influence of any substance, illegal or otherwise.

Likewise, the hospital records do not indicate any notation of Mr. Ballew appearing impaired. Rather, those records indicate Mr. Ballew was in severe pain, to the point of almost fainting, just forty minutes prior to the drug test. (Ex. 2 at 6.) ("Positive for dizziness, near syncope.") He was anxious, diaphoretic and uncomfortable. *Id.* However, nothing in his demeanor prompted either a notation of possible intoxication or

---

negative, given the dispositive factual findings regarding proximate cause and rebuttal of the presumption by clear and convincing evidence.

[4] While recognizing Shomaker's concerns regarding the questionable drug test, the Court also considered the logistics of the alleged falsification. Mr. Ballew described his difficulty in producing a urine sample while his left hand was bandaged. It stands to reason the dexterity required to obtain, conceal, and transfer some type of urine container would prove more daunting. Moreover, such discussion presupposes his fraudulent intent in devising a scheme to have his sister come to the hospital and then have her transfer to him a container of drug-free urine, which he would pour in a specimen cup after having concealed the false sample on his person. Mr. Ballew would have performed this sequence of events after the traumatic amputation of two fingers, receiving medical treatment including sutures and, ironically, being administered morphine and a "digital block" to the fingers. Further, he would have performed all these tasks while his bleeding left hand was wrapped in bandages. The mental acumen involved in both concocting and implementing such a scheme far outweighs the capabilities needed to place his left hand above the turning wheel. In other words, Shomaker cannot at once proclaim Mr. Ballew so impaired as to foolishly place his hand in a position of danger, while at the same time deeming him competent enough to perpetrate the fraudulent drug test.

7

any hesitancy on the part of the hospital staff to administer pain medications.

Mr. Ballew testified he neither used, nor was he under the influence of any controlled substance, on the date of injury. His wife testified he left home at his usual time the morning of the injury and was not under the influence of any substance, illegal or otherwise. She also testified Mr. Ballew did not use illegal drugs, abuse legal drugs or use any drug for some years prior to the injury.

Most telling is the testimony of his co-worker, Mr. Ozment, who testified that Mr. Ballew did not appear impaired in any way. Mr. Ballew acted as he always acted while at work. The two men had worked together for eight years, lending credence to Mr. Ozment's assessment of Mr. Ballew's usual behavior. Importantly, the two men had operated the head saw for several hours before Mr. Ballew was injured. The evidence, through his wife's testimony and that of Ms. Shomaker, indicates Mr. Ballew typically reported for work before 7 AM. He was injured shortly after twelve noon. (Ex. 2 at 9.) While performing the physical labor of off-loading for those nearly five hours, he was under the constant observation of Mr. Ozment, who would have had ample opportunity to perceive any odd behavior. If Mr. Ozment had indeed perceived odd behavior, it does not follow that he would have turned the wheel upon Mr. Ballew's purported signal to do so.

Taken in its totality, the Court finds the evidence leaves no serious or substantial doubt that the injury was not caused by illegal drug use and that it is highly probable it was not. While Shomaker argues that Mr. Ballew, if functioning with normal faculties, would not have placed his hand on the beam where he did, the Court cannot conclude that he did so because of intoxication. Likewise, if he indeed signaled Mr. Ozment to spin the wheel with a hand motion, the Court does not believe the evidence establishes he did so because of any intoxication and, even if he made the spinning motion, he could not have moved his hand quickly enough after the wheel was activated to avoid injury. *See McIntosh, supra.*

*Absence of proximate cause*

The proximate cause of an injury is an action which is a procuring, efficient, and predominant cause. *Solomon v. Hall*, 767 S.W.2d 158, 161 (Tenn. Ct. App. 1988). It means cause in fact or that, "but for" the actor's negligence, the injury would not have occurred. In order to establish proximate cause, a party must introduce evidence that affords a reasonable basis for the conclusion that it is more likely than not that the conduct of a party was a cause in fact of the injury. *Sumner v. United States*, 794 F. Supp. 1358, 1368 (M.D. Tenn. 1992). The Court cannot find from the evidence that Mr. Ballew's actions, in either placing his hand on the beam or signaling Mr. Osment to spin the wheel, were separately, or in concert, the proximate cause of the injury.[5] However,

---

[5] The Tennessee Workers' Compensation Law provides an employer "shall . . . pay . . . compensation . . . without

even if they were, he has rebutted the presumption that intoxication caused him to perform those actions.

*Causation*

Having found the intoxication defense inapplicable, the Court turns to the issue of causation. To be compensable under the Workers' Compensation Law, an injury must arise primarily out of and occur in the course and scope of the employment and be caused by an incident or specific set of incidents. Tenn. Code Ann. § 50-6-102(13) (2014). Medical evidence is generally required in order to establish a causal relationship, "[e]xcept in the most obvious, simple and routine cases." *Cloyd v. Hartco Flooring Co.*, 274 S.W.3d 638, 643 (Tenn. 2008) (quoting *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991)). The Court considers this an obvious case; the spinning log turner amputated Mr. Ballew's fingers.

*Extent of disability*

For post-July 1, 2014 injuries, permanent partial disability is paid at sixty-six and two-thirds percent of the injured employee's average weekly wage for the period of compensation as determined by multiplying the employee's impairment rating by 450 weeks. Tenn. Code Ann. § 506-207(3)(A) (2014). Because Mr. Ballew returned to employment at the same or greater wage during his initial compensation period, he is limited to these benefits and not entitled to any enhancement factors.

Dr. Dolan assessed a 5% permanent partial impairment to the body as a whole pursuant to the AMA Guides. (Ex. 3 at 105.) Dr. Chung, using the same reference, assessed an 8% permanent partial impairment to the body as a whole. (Ex. 6 at 98.) Subject to rebuttal by a preponderance of the evidence, Dr. Dolan's impairment rating is presumed accurate. Tenn. Code Ann. § 50-6-204(k)(7) (2014).

When considering the two ratings, the Court notes Dr. Dolan relied upon a thorough "Impairment Rating Recommendation" of a licensed occupational therapist. (Ex. 3 at 100.) That evaluation report specifically states, "Both Diagnosis and ROM models are included, with notation that the ROM was deemed most favorable to the patient." *Id.* The Diagnosis Model yielded the 5% rating and the ROM Model yielded a 7% rating. Dr. Dolan adopted the 5% rating. The report indicates the Diagnosis Model specifically considered the amputation level of Mr. Ballew's fingers and incorporated the range of motion loss as a "Physical Examination Adjustment." *Id.* at 101.

---

regard to fault as a cause of the injury." Tenn. Code Ann. § 50-6-103 (Tenn. 2014). Therefore, the Court addresses proximate cause solely in analysis of the drug-testing inference. It is not necessary for the Court to determine what or who caused the injury, so long as it determines Mr. Ballew's actions were not the proximate cause of injury or, alternatively, that he rebutted the presumption intoxication was the proximate cause.

Dr. Chung's report indicates he utilized a table in the AMA Guides for amputation impairments and tables for impairment due to range of motion loss. (Ex. 6 at 98.) When he combined the amputation impairment with the range of motion loss, he arrived at an impairment of 8% to the body as a whole.

In analyzing whether Mr. Ballew has rebutted Dr. Dolan's rating by a preponderance of the evidence, the Court notes the AMA Guides provide:

> Diagnosis-Based Impairments [are] the method of choice for calculating impairment. Range of motion is used primarily as a factor in the Adjustment Grid: Physical Examination . . . [The Range of Motion] section is to be used as a **stand-alone** rating when other grids refer you to this section or when no other diagnosis-based sections of this chapter are applicable for impairment rating of a condition. (Emphasis in original).

Am. Med. Ass'n, <u>Guides to the Evaluation of Permanent Impairment</u> 461 (6th ed. 2008).

Dr. Dolan utilized the Diagnosis-Based Model preferred by the AMA Guides. Our courts have noted that the AMA Guides provide physicians "with multiple methods of assessing medical impairment." *Beeler v. Lennox Hearth Products*, No.W2007-02441-SC-WCM-WC, 2009 Tenn. LEXIS 27, at *12 (Tenn. Workers' Comp. Panel Feb. 18, 2009). In *Beeler*, the court found the employee had not rebutted a rating by the applicable standard in that case but instead found the presumptive rating correct. *Id.* Likewise, this Court cannot find Dr. Chung provided any basis in his report as to why the Range of Motion Model was preferred over the Diagnosis-Based Model. Accordingly, under the evidence in this case, the Court finds Mr. Ballew has not rebutted the presumption of accuracy of Dr. Dolan's rating and sets the impairment rating at 5% to the body as a whole. It follows that Mr. Ballew's permanent partial disability is 450 weeks multiplied by 5%, a period of twenty-two and one-half weeks. The Court further finds Mr. Ballew is entitled to reasonable and necessary future medical benefits pursuant to statute.

*Discretionary costs*

Mr. Ballew requested certain discretionary costs. The statute allows the Court to award discretionary costs for such expenses as reasonable expert deposition fees. Tenn. Code Ann. § 50-6-239(c) (2014). Otherwise, the statute is silent as to what costs might be recoverable. However, Tennessee Rule of Civil Procedure 54.04(2) also provides for the recovery of certain discretionary costs. *See also Lock v. National Union Fire Ins. Co.*, 809 S.W.2d 483, 489 (Tenn. 1991).

Here, Mr. Ballew requests recovery of medical records request fees, Dr. Chung's independent medical evaluation fee and C-32 fee, a fee for another medical expert

consultation, and subpoena service fees. The Court finds only the C-32 fee to be a recoverable discretionary cost. However, the actual C-32 form simply stated, "Refer to the IME Report." (Ex. 6 at 108.) The Court cannot find that the C-32 added to the necessary expert proof. Hence, the motion for discretionary costs is denied in its entirety.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. Ballew shall recover from Shomaker permanent partial disability benefits in the amount of $8,303.85, representing a 5% permanent partial disability to the body, or 22.5 weeks of compensation. These benefits, having accrued, are payable in a lump sum.

2. Mr. Ballew shall receive lifetime future medical benefits pursuant to statute.

3. Mr. Ballew's motion for discretionary costs is denied.

4. Costs of this cause of $150.00 are assessed against Shomaker pursuant to Tenn. Comp. R. and Reg. 0800-02-21-.07 (2015), to be paid within five days of this order becoming final.

**ENTERED this the 6th day of November, 2015.**

**Judge Allen Phillips**
**Court of Workers' Compensation Claims**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Compensation Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within thirty business days* of the date the Workers' Compensation Judge entered the Compensation Hearing Order.

3. Serve a copy of the Compensation Hearing Notice of Appeal upon the opposing party.

11

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The party filing the notice of appeal, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within fifteen calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the party filing the appeal may file a joint statement of the evidence within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board. *See* Tenn. Comp. R. & Regs. 0800-02-22-.03 (2015).

6. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Workers' Compensation Appeals Board, the appeal will be docketed and assigned to an Appeals Board Judge for review. At that time, a docketing notice shall be sent to the parties. Thereafter, the parties have fifteen calendar days to submit briefs to the Appeals Board for consideration. *See* Tenn. Comp. R. & Regs. 0800-02-22-.02(3) (2015).

# APPENDIX

Exhibits:

1. Drug Test and supporting documents;
2. Medical Records of McKenzie Medical Center;
3. Medical Records of Dr. Michael Dolan;
4. Medical Records of Southern Hand Center;
5. Dr. Howard Taylor Report and supporting documentation;
6. Independent Medical Evaluation of Dr. Samuel Chung;
7. Photograph of machine (including markings by Mr. Ballew of where his hand was placed and the spinning wheel);
8. Notice of Denial;
9. C-42 Choice of Physician Form; and
10. Curriculum Vitae of Dr. Howard Taylor.

Technical record:[6]
1. Petition for Benefit Determination; and
2. Dispute Certification Notice.

---

[6] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Expedited Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence. The Court noted additional issues in the DCN of mileage and a child support lien, but neither party introduced evidence regarding these issues.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 6th day of November, 2015.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|------|------|------|------|
| James Bradberry, Employee's Counsel | | | X | jim@bradberrylaw.com |
| Lee Ann Murray, Employer's Counsel | | | X | leeamurray@feeneymurray.com |

**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**